136 N.J. Super. 560 (1975)
347 A.2d 365
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-APPELLANT,
v.
COOPER ALLOY CORPORATION, A CORPORATION OF NEW JERSEY, ETC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 13, 1975.
Decided July 16, 1975.
*564 Before Judges MATTHEWS, FRITZ and BOTTER.
Mr. Richard L. Rudin, Deputy Attorney General, argued the cause for appellant (Mr. William F. Hyland, Attorney General, attorney; Mr. Matthew M. Millichap, Deputy Attorney General, on the brief).
Mr. Walter J. Fessler argued the cause for respondent (Messrs. Lum, Biunno & Tompkins, attorneys; Mr. Joseph R. McMahon, of counsel).
PER CURIAM.
Defendant Cooper Alloy Corporation was the owner of a parcel of land containing 14.86 acres in the Township of Hillside, Union County, which was zoned industrial. The premises contain an alloy and stainless steel casting foundry, and had frontage on three streets. The State, by the Commissioner of Transportation (State), sought to condemn two parcels totaling 3.173 acres in fee, and two easements, for the construction of mainline Route I-78. The area taken in fee contained no building improvements and was used for the storage of metals and the dumping of waste products from the foundry. One easement was acquired for the construction of a footing for a retaining wall, and the second was acquired for the reconstruction of a drainage ditch on the remaining property for surface *565 water drainage. After the taking, the remaining property consisted of 11.687 acres encumbered by these two easements.
Cooper Alloy's claims for damages primarily revolve around the testimony of its consultant Kennelli, that after the taking it would be economically inefficient to expand the production of the foundry to a 6,000,000-pound capacity on the remaining land. The 6,000,000-pound figure represents that expert's "guess" as to the production required for Cooper Alloy to retain its share of the market for its product. During the mid-1960s Kennelli had recommended that Cooper Alloy should relocate its small molding operations (shell molding and green sand) to Alabama. That relocation would, in his judgment, enable Cooper Alloy to maintain its share of the market, which was 4 1/2% in 1965. Kennelli presented production figures which showed that Cooper Alloy had produced a little under 4,000,000 pounds up to 1967 but had fallen off to 3,200,000 pounds thereafter because of changes in production brought about by the imminent condemnation. Kennelli said that the lost production arose because of a loss of 1 1/2 acres of storage materials which now had to be stored on the remainder. He again recommended, after the taking, that Cooper Alloy expand elsewhere and recapture its lost production because, both the expansion and recapture of capacity were not economically feasible on the remainder. Kennelli was of the opinion, however, that the remaining capacity in Hillside should be retained rather than phased out.
The consultant further estimated that it would cost $2,313,000 to attain 6,000,000 pounds on the remaining lands in Hillside, but that the result would be "an economically inherent inefficient operation." The cost of moving to the new site in Alabama was projected as $2,272,000, but the relocation, in his opinion, would enable the company to reach 6,000,000 pounds and permit more extensive growth at some future date. Since it would take 18 to 24 months *566 to set up a new operation in Alabama, Kennelli believed that it was necessary to duplicate portions of the Hillside operations in Alabama, instead of moving all of the Hillside equipment immediately, in order to prevent the loss of business that would consequently result from the temporary cessation of operations. Kennelli recommended, to expedite the transition, that the small molding operations should be first established in Alabama because they were the easiest to set up.
Kennelli testified that, as of March 31, 1971, Cooper Alloy had expended $410,855 in Alabama for constructing the shell molding operation, of which a total of $156,154 constituted a direct duplication of equipment. Kennelli deducted $48,142 from this sum as the "value installed in place" of certain pieces of equipment moved from Hillside to Alabama, $11,266 as the value of other equipment which remained in Hillside and was being used there, and $10,000 as the salvage value of other pieces of shell molding equipment which remained in Hillside but were rendered useless by the loss of the area to expand; this left a net cost of duplicating the shell molding operation in Alabama at $86,746.
The gross cost for duplicating the green sand equipment in Alabama was $286,746. From this sum Kennelli deducted $31,831 as the value of equipment moved to Alabama, $36,100 for useable equipment which remained in Hillside, and $22,000 as the salvage value of "useless equipment" at the Hillside plant, for a net cost of duplication of the green sand equipment of $196,815.
Kennelli also testified to an alleged damage of $55,000 for engineering and consultation fees attributable to the construction of that portion of the facilities in Alabama that corresponded to the loss of the 800,000 pounds of production at the Hillside plant which Cooper Alloy claims was to be attributed to the taking.
The trial judge held that it was permissible for Cooper Alloy to show the extent of the damage to the remainder in *567 terms of a "cost to cure" theory, through evidence of what it cost to duplicate the Hillside equipment in Alabama less the residual value of the Hillside equipment. The reasoning seems to have been that Cooper Alloy was entitled to compensation for damage to the remainder, and that such damage included consequential damages, one element of which was the loss of 800,000 pounds in production capacity; further, that the value of that loss could be determined by recourse to the cost of recovery of the 800,000 pounds of production capacity, and that one measure of the cost of cure was the amount necessary to construct substitute facilities.
The State argues that the costs of duplicating equipment in Alabama and the engineering and duplication fees are unrelated to any diminution in value of Cooper Alloy's remaining property in Hillside, and thus were too speculative to have been considered by the jury on the question of severance damages.
Unquestionably, Cooper Alloy is entitled to just compensation for the taking of its property for a public purpose. Generally, the fair market value of the property taken, as of the date of the taking, is the measure of an award of such compensation. N.J.S.A. 20:3-30; State v. Nordstrom, 54 N.J. 50, 53 (1969); State v. Gorga, 26 N.J. 113, 115 (1958). That value is stated to be the price which would voluntarily be reached after arms'-length negotiations between an owner willing to sell and a buyer willing to purchase as of the date of taking. Trenton v. Lenzner, 16 N.J. 465, 476 (1954), cert. den. 348 U.S. 972, 75 S.Ct. 534, 99 L.Ed. 757 (1955). In a case such as this, which involves a partial taking, the compensation to be paid a condemnee should be the difference between the market value of the entire property immediately before and unaffected by the taking, and the market value of the remainder immediately after and as affected by the taking. Alternatively, it may be the value of the property taken *568 based upon its highest and best use, plus compensation for any diminution in value resulting to the remainder from the taking. State v. Mehlman, 118 N.J. Super. 587, 590 (App. Div. 1972); State v. Speare, 86 N.J. Super. 565, 572 (App. Div. 1965), certif. den. 45 N.J. 589 (1965). Cf. Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 125 (1958).
While it may generally be said that it is the property owner's loss, not the taker's gain, which is the basis for the admeasurement of just compensation, not all losses suffered by a condemnee are compensable. For example, damages or costs of a speculative nature are always noncompensable. Clementon Housing Auth. v. Myers, 115 N.J. Super. 467, 475-476 (App. Div. 1971). Just compensation generally does not include losses or costs that are incidental to a taking, such as loss to or destruction of good will, loss of profits, inability to relocate or frustration of the condemnee's plans. These items are generally held not to be directly attributable to the realty, but rather peculiar to the owner. Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893). The fact that these losses are noncompensable is justified on the grounds that their value is too speculative, remote and too uncertain for accurate measurement; that they depend on various factors not attributable to the land and, accordingly, furnish no reliable criteria for the fixing of market value at the time of the taking. United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945); State v. Gallant, 42 N.J. 583, 587 (1964); Port of New York Authority v. Howell, 59 N.J. Super. 343, 348-349 (Law Div. 1960), aff'd 68 N.J. Super. 559 (App. Div. 1961), certif. den. 36 N.J. 144 (1961). Similarly, loss of business profits derived from a going business conducted on the property taken is not the subject of independent compensation aside and apart from the market value of the land taken. Such a business loss is admissible only to show the *569 highest and best use of the land before the taking and the inadaptability of the remaining land to continue such use. N.J. Highway Authority v. Rue, 41 N.J. Super. 385, 387-388 (App. Div. 1956), certif. den. 22 N.J. 340 (1956).
It has also been held that the costs of moving industrial equipment are noncompensable. State v. Gallant and Port of New York Authority v. Howell, above. While Clementon Housing Auth. v. Myers, above, permitted moving expenses of industrial machinery and equipment that constituted a functional unit with the building and land, it is, nevertheless, the condemnor's option to pay either moving expenses or the value of the machinery and equipment as a functional unit. 115 N.J. Super. at 480. In no instance, however, may the moving expenses recoverable exceed the amount by which the machinery and equipment enhances the value of the land and building. Beyond this, we question the literal applicability of the Clementon rule to a partial taking which has left the business substantially whole except for a limitation on expansion.
Here, Cooper Alloy's business decision to split its operations was actually unrelated to the value of the realty remaining after the taking. When the trial judge allowed testimony concerning the capacity in pounds of the operation, the company's share of the market and its ability to expand in Hillside, he introduced a collateral and misleading element into the case. Despite Cooper Alloy's claim that it was basing its claim for damages on the loss of 800,000 pounds of production which allegedly resulted from the imminent taking, in reality its decision to establish a second operation in Alabama was based on the hard economic fact that it would not be able to expand efficiently to the 6,000,000-pound figure on the remaining property in Hillside in order to maintain its alleged share of the high-alloy casting market. That business judgment was irrelevant to the issue before the jury, which should have been concerned solely with the value of the Hillside property as of November 29, 1971. The claimed inability of the condemnee to *570 expand to 6,000,000 pounds was nothing more than coincidental to the taking and subject to numerous contingencies. Cf. State v. Mehlman, above.
While it is true that the concept of just compensation should be flexible, Trenton v. Lenzner, above, and a trial judge should have considerable discretion in a condemnation case in determining the method of proof and the materiality of evidence, State v. Azzolina Land Corp., 101 N.J. Super. 103, 108 (App. Div. 1968), that flexibility and the exercise of discretion must always result in the jurors being instructed to reach a measure of damages capable of reasonable ascertainment so that they will be prevented from speculation in reaching a verdict. State v. Wemrock Orchards, Inc., 95 N.J. Super. 25, 31 (App. Div. 1967), certif. den. 50 N.J. 92 (1967).
We find no authority for the trial judge to have permitted Cooper Alloy to present evidence below of the cost of substitute facilities. Although reproduction costs may be an appropriate aid in determining market value where other methods are not available, a condemnor is not obliged to duplicate existing facilities taken unless those facilities belong to a public body and are used for a public purpose. State v. South Hackensack Tp., 65 N.J. 377 (1974). While there is a right to recover for proximate damage done to the remaining land, the damage must be to the land, not to the business which is operated on that land. See 4A Nichols, Eminent Domain (3 ed. 1974), § 14.1(1) at 14-21 to 14-24. The problem that arose here is that the trial judge used the damage to the business conducted on the remaining lands as a yardstick to measure the damage to the remainder.
The State also objected to the condemnee's claim of damage of $55,000 for engineering and consultation fees attributable to that portion of the Alabama facilities corresponding to the claimed loss of 800,000 pounds of productive capacity in Hillside. Since those expenditures neither enhanced the market value of the Hillside real estate nor depreciated *571 the market value of the Hillside remainder, they were improperly considered.
Kennelli also testified, over the State's objection, to a recurring damage of $13,585 a year, arising from the loss of Cooper Alloy's capacity to dump its wastes on the adjoining railroad property under a contract right terminable, however, by the railroad on 30 days' notice. The record is somewhat confusing with respect to this figure. When Kennelli was shown that access to the railroad property after the taking would be available through a relocated street, he had first claimed not to know what the increase in cost, if any, of disposal would be because the new route would be more circuitous. On redirect examination he stated that the increased cost of hauling over the new route would amount to $7,000 or $8,000. It seems to us, however, that the figure that went to the jury was not the latter, but the original estimate based upon a total denial of access.
We find it difficult, if not impossible, to determine on the record before us whether the condemned portion of Cooper Alloy's property still permitted direct access to the uncondemned leased railroad property. If it did, the splitting off of the remainder from the contiguous railroad land would present a proper subject of severance damages. However, if the portion of the leased property condemned would cut off the condemnee's full tract from direct access with the uncondemned portion of the leasehold, the additional cost of using a more circuitous route through the re-routed street would not be compensable. Obviously, the State could take the condemned part of the leasehold and oust Cooper Alloy on 30 days' notice. Since the damage to the remainder must result from the portion of the original tract condemned rather than the public use of some other property, Public Service Elec. & Gas Co. v. Oldwick, 125 N.J. Super. 31 (App. Div. 1973), certif. den. 64 N.J. 153 (1973), the damage to the remainder here would arise from the public use of the railroad's property, not from the use of the condemned portion of Cooper Alloy's land. The mere additional expense *572 of using a circuitous route would, under those circumstances, not be the proper subject of a damage award.
The judgment of the Law Division is reversed and the cause remanded for a new trial.