671 A.2d 121

STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANS-
PORTATION, PLAINTIFF–APPELLANT, v. FRED WEISWAS-
SER AND GERALDINE WEISWASSER, DEFENDANTS–RE-
SPONDENTS. AND TOWNSHIP OF HAINESPORT, IN THE
COUNTY OF BURLINGTON, A MUNICIPAL CORPORATION OF
THE STATE OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued November 1, 1995—Decided February 2, 1996.

288

Before Judges KING, KLEINER and HUMPHREYS.

*George P. Ljutich* argued the cause for appellant (*Deborah T. Poritz*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Mr. Ljutich*, Deputy Attorney General, on the brief).

*David S. Brandt* argued the cause for respondent (*Brandt, Haughey, Penberthy, Lewis & Hyland, P.A.*, attorneys; *Patrick F. McAndrew*, of counsel and on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

This is an appeal by the State of New Jersey and cross-appeal by defendants, Fred Weiswasser and Geraldine Weiswasser, property owners, in a condemnation action pursuant to the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –50. We are called upon to determine two questions of first impression in New Jersey: (a) whether the State may require a condemnee to accept substitute real estate or the value thereof as compensation for the condemned real property; and (b) whether the loss of visibility to the remainder of property after condemnation by the State is compensable to the condemnee.

On November 13, 1986, the State filed a Declaration of Taking of .39 acres of land owned by defendants. The condemned property directly abuts Route 38 in Burlington County and includes 255 feet of highway frontage. The State intended to utilize the condemned property to construct a jughandle on Route 38. Pursuant to its Declaration of Taking, the State deposited $165,-000 with the Clerk of the Superior Court on January 5, 1987. On February 10, 1988, the State amended its Declaration of Taking and deposited an additional $4,000 with the Clerk's office. On January 6, 1987, defendants filed a notice of application to withdraw the initial deposit from the court and did withdraw those funds. After the amended Declaration of Taking, defendants

withdrew the additional $4,000 deposit pursuant to a notice of application.

A Condemnation Commissioners' hearing was conducted and on May 20, 1988, defendants were awarded $390,000. The State's expert opined that just compensation for the condemned land and severance damages to the remainder totalled $169,000. Defendants offered testimony that just compensation was $604,000, excluding severance damages to the remainder attributable to a reduction in exposure to Route 38. Defendants' valuation was predicated on replacement value with adequate ingress and egress. The State appealed that decision and defendants cross-appealed to the Law Division.

After a series of pretrial rulings that constitute the crux of the issues raised on appeal, the matter proceeded to a jury trial. The jury returned a verdict of $204,000 for defendants. An order for judgment was entered requiring the State to deposit with the Clerk of the Superior Court an additional $35,000, representing the balance of the award.

We affirm.

I

Defendants purchased for investment purposes a tract of land measuring approximately 112.38 acres. The land, which is vacant, is situated in the Township of Hainesport, Burlington County, and has limited frontage on Route 38 and limited frontage on Bullshead Road. As of the date of valuation, October 15, 1987, approximately 19 acres were zoned commercial and residential and 93.38 acres were zoned residential.

Prior to the taking, the property included five points of road frontage, four on Route 38 and one on Bullshead Road. Although defendants had never applied for access permits, access would

have been permitted at all five points of frontage.[1] On Route 38, three of the points of frontage are narrow strips of land that lie between property owned by third parties. The fourth point of frontage is a wider area with 278.5 feet of frontage on Route 38. The area between the 278.5–foot frontage and a 62–foot frontage to the northeast, also on defendant's property, was owned by Ronald Firth. The condemned area totals .39 acres and includes 255 feet of frontage within the 278.5–foot frontage area.

Subsequent to the valuation date and the Condemnation Commissioners' hearing, the State purchased the Firth property. The Firth property totals .37 acres, nearly equivalent to the condemned .39–acre tract, and has approximately 150 feet of frontage on Route 38. The State purchased the property to replace the frontage lost by defendants as a result of the condemnation and to cure the severance damages by providing frontage that could serve as an access point to the remainder of defendants' property. The Firth property would provide defendants with a continuous stretch of frontage of 236 feet, made up of 24 feet remaining adjacent to the condemned frontage site plus 150 feet from the replacement Firth property plus condemnee's adjacent 62–foot frontage strip.[2]

On January 30, 1992, the State reduced its offer to defendants, offering $117,700 or, in the alternative, the Firth property (valued at $114,000) plus $3,700 cash. The State's revised offer was predicated upon the opinion of appraiser Joseph Manzi that the Firth property would operate effectively as a cure for the severance damages which resulted from the taking. Defendants rejected the revised offer. At trial, the court precluded the State from admitting evidence of the acquisition of the Firth property as a

---

[1] The expert testimony offered by the State pertinent to the right to access to defendants' property was uncontradicted at trial.

[2] The 24–foot section of frontage is that which remains of the original 278.5 feet of frontage less the condemned 255 feet.

curative offset. As a result, the State was forced to rely solely upon the testimony of its expert, John Borden.

Prior to trial, the State apprised the court of the fact that Borden was prepared to testify to two separate valuations of just compensation: one including damages for loss of visibility from Route 38 to the remainder of defendant's property after condemnation and the second excluding visibility loss damages. The State moved to exclude the second Borden appraisal. The State presented Borden's testimony at the motion *in limine*. The trial judge denied the State's motion and ruled that Borden's testimony should include damages attributable to the loss of visibility.

Prior to trial, the State also moved *in limine* for an order resolving issues pertinent to access to defendants' property. Defendants contended that the issue of reasonable access was an issue which raised a jury question. The trial judge entered an order which provided:

1. Reasonable access remains, as a matter of law, to the approximately 93 acres of the subject property, zoned "R–1 Residential," after the State's acquisition, described in the complaint filed in this matter.

2. The issue of whether reasonable access remains to the approximately 19 acres of the subject property, zoned "AC Residential/Commercial," after the State's acquisition, described in the complaint filed herein, is a question of fact, to be determined by the trier of fact in this matter.

At trial, Borden testified that the just compensation to defendants would be $204,000. Defendants presented testimony that just compensation would be in the amount of $400,300. As noted, the jury returned a unanimous verdict of $204,000.

On appeal, the State contends that the trial court erred in prohibiting it from introducing evidence that it had purchased land adjacent to defendant's condemned property and had offered that land to defendants as partial compensation. The State also contends that the trial court erred in failing to exclude testimony of loss of visibility damages to the remainder of defendants' property.

In its cross-appeal, defendants contend that the trial court erred in determining that the issue of accessibility to their residential

zoned property was one of law to be addressed to the court. At oral argument on appeal, defendants submitted that if the State does not prevail on its appeal, they would abandon their cross-appeal.

We conclude for the reasons discussed hereafter that the trial court correctly ruled on both of the State's applications, namely (1) prohibiting evidence that the State had purchased land adjacent to defendants and had offered same to defendants as partial compensation, and (2) permitting evidence of severance damages which included damages attributable to a loss of visibility. We accordingly affirm the judgment entered after the jury verdict. Defendants' cross-appeal is therefore moot and is dismissed.

## II

*N.J.S.A.* 20:3–29 provides, "The condemnee shall be entitled to compensation for the property, and damages, if any, to any remaining property, together with such additional compensation as provided for herein, or as may be fixed according to law." The Supreme Court has concluded that the statute mandates an award of "just compensation." *State v. Silver*, 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983). *See also N.J. Const.* art. I, ¶ 20; *U.S. Const.* amend. V. Just compensation must be fair to both the landowner and the condemning authority. *Port of N.Y. Authority v. Howell*, 59 *N.J.Super.* 343, 347, 157 *A.*2d 731 (Law Div.1960), *aff'd*, 68 *N.J.Super.* 559, 173 *A.*2d 310 (App.Div.1961).

In *Silver*, the Court concluded that "where only a portion of a property is condemned, the measure of damages includes both the value of the portion of land actually taken and the value by which the remaining land has been diminished as a consequence of the taking." 92 *N.J.* at 514, 457 *A.*2d 463. Because the State in the instant matter did not take the entirety of condemnees' property, just compensation should be ascertained by considering not only the value of the portion taken but also the reduction in value, or severance damages, of the remainder.

The statutory scheme for compensation in eminent domain matters does not expressly contemplate compensation in the form of real property. In fact, the State is required to deposit with the court the amount of estimated compensation upon filing the declaration of taking. *N.J.S.A.* 20:3–18. The condemnee is then permitted, upon application, to withdraw the funds prior to judgment. *N.J.S.A.* 20:3–23. This implies that proper compensation takes the form of money. However, the fact that the State is required to deposit money with the court does not necessarily mean that the ultimate judgment must be paid from those funds.

There are two recognized formulae to be used in determining just compensation. *Silver, supra,* 92 *N.J.* at 514, 457 *A.*2d 463. Both are acceptable. The first formula sets the measure of damages at "the market value of the land taken plus the difference before and after the taking in market value of the remainder area." *Ibid.* (quoting *Village of South Orange v. Alden Corp.,* 71 *N.J.* 362, 367, 365 *A.*2d 469 (1976)). The second formula equates damages with "the difference between the value of the entire tract before the taking and the value of the remainder after the taking." *Ibid.*

Although the State recognizes that *Silver* focused on those two recognized formulae, it argues that neither formula requires a specific method of compensation, nor prohibits as an appropriate measure of compensation the value of adjacent replacement land, such as the Firth property which was offered by the State to defendants together with the differential value of the land taken. In support of this alternate form of compensation, the State contends that its offer to defendants should have been admissible because it is consistent with the general proposition that a condemnee in an eminent domain proceeding is under a duty to mitigate damages, including severance damages.

The concept of mitigation of damages in eminent domain matters has gained specific judicial approval in other jurisdictions. *See, e.g., Mayes Co. v. State,* 18 *N.Y.*2d 549, 277 *N.Y.S.*2d 393, 223 *N.E.*2d 881 (1966) (denying severance damages when condemnee

refused to permit the drilling of a well by the State to replace water source that had been condemned); *Albers v. County of Los Angeles,* 62 *Cal.*2d 250, 42 *Cal.Rptr.* 89, 101, 398 *P.*2d 129, 141 (1965) ("the general rule is that an owner whose property is being taken or damaged by a public entity is under a duty to take all reasonable steps available to minimize his loss."); *State v. Casey,* 263 *Minn.* 47, 115 *N.W.*2d 749 (1962) (concluding that a landowner is not entitled to recover compensation from the state for damages which he could mitigate, but also concluding that mitigation measures that are too speculative will not be required). However, the State has not cited any decision in New Jersey which directly discusses mitigation of damages in an eminent domain proceeding.

The State does cite *State v. Birch,* 115 *N.J.Super.* 457, 280 *A.*2d 210 (App.Div.1971), and *State v. Sun Oil,* 160 *N.J.Super.* 513, 390 *A.*2d 661 (L.Div.1978), as support for its contention. In *Birch,* the State condemned property so that it could construct a highway across the owner's property. 115 *N.J.Super.* at 460, 280 *A.*2d 210. The taking landlocked a portion of the condemnee's property, preventing access to a main thoroughfare. *Ibid.* Both parties agreed that a road would have to be built to provide the condemnee with access to the thoroughfare. There was no dispute that the cost of construction of the road would be included in the condemnee's severance damages. At issue was whether the cost of conforming the road to local zoning regulations would be included in severance damages and, in fact, whether the municipality could enforce those regulations against condemnee's access road. *Id.* at 461, 280 *A.*2d 210.

On appeal, we found that "the cost of ameliorating or curing [the severance damage] was an important factor to be considered in arriving at its fair market value." *Id.* at 463, 280 *A.*2d 210. The fair market value, of course, would be used to determine the extent of the severance damages to the remaining property. We did not speak in terms of a "duty of a condemnee to mitigate severance damages" or "the right of the State to compensate a condemnee with real property."

The mitigation of damage concept was more definitively discussed by the Law Division in *State v. Sun Oil*. In *Sun Oil*, condemnation of part of the owner's property rendered his use of the property impossible in light of the local zoning ordinance. 160 *N.J.Super.* at 517, 390 *A.2d* 661. The court determined that the condemnee could have applied for a variance and should not have simply sat on his hands and expected full compensation where some action of his could have mitigated the damage. However, the holding is limited to mitigating by constructing reparative facilities and applying for variances on the remainder property and does not specifically extend to a condemnee's duty to accept replacement property offered by the condemnor.

The State has cited only one decision, *Utah Dep't of Transp. v. Rayco Corp.*, 599 *P.*2d 481 (Utah 1979), which it contends supports the concept that the State may compensate a condemnee with adjacent real property. In *Rayco*, a minority view stated:

> A condemnee should not be awarded damages as if the taking rendered his remaining land unfit for its established use if the means of cure, or of minimizing damages, is available by exercising reasonable prudence; and this is true even if it involves making expenditures for substitute facilities, whether within his own land or outside its boundaries.
>
> [*Id.* at 494.]

Defendants also cite *Rayco* and contend that it supports their position that the State's offer cannot bind a condemnee to accept adjacent property as compensation. Defendants stress that the minority view cited by the State does not express the actual holding of the Utah Supreme Court.

*Rayco* involved the taking by the State of Utah of a fifty-foot wide strip of property that constituted the boundary of a supermarket's property along a main thoroughfare. *Id.* at 485. The taking reduced the number of parking spaces available to the supermarket below the minimum set by the local zoning ordinance. *Ibid.* Thus, one issue in the case was whether the measure of compensation should include the cost to the owner of improving the remaining property so that it would conform to the zoning ordinance. However, the primary issue was "whether the

severance damage could be mitigated by the acquisition and improvement of replacement property." *Id.* at 486. The State sought to compel the owner to acquire contiguous property for the purpose of remedying severance damages. *Ibid.*

A careful reading of *Rayco* reveals that the majority of the Utah Supreme Court refused to affirm a rule that would be "tantamount to compelling the condemnee to take substitute land in lieu of money for the damages sustained." *Id.* at 490. The Court emphasized the rule in Utah that compensation be fixed in terms of money, and that real property would not be substituted in lieu of money against the wishes of the condemnee. *Ibid.* (quoting *Shurtleff v. Salt Lake City*, 96 *Utah* 21, 82 *P.*2d 561 (1938)).

The Utah Court found that the replacement property could not ameliorate the problems caused by the State's acquisition. *Ibid.* The replacement property would have provided parking to the side of, not immediately in front of, the store. *Ibid.* The replacement property was zoned for a different use and whether parking was a permitted use was uncertain. *Ibid.* Furthermore, access to the property would be reduced under the State's plan. Access points would be reduced from six to three and tractor trailers may have been unable to gain access from the replacement property. *Ibid.*

The State differentiates *Rayco* from the facts pertinent to defendants' property by stressing that the Firth property is zoned for the same usage as defendants' condemned property and that the Firth property would provide defendants with access to Route 38, otherwise lost by the condemnation.[3] However, the State does admit that a building on the Firth property would require demolition. Additionally, the State concedes that the discussion in

---

[3] Although the State asserts that the Firth property is zoned for the same use as defendants' condemned property, there is no specific proof of that fact in the record. We may accept the contention as correct as the Firth property adjoins defendants' property and shares adjacent frontage on Route 38. It is therefore likely that both parcels are zoned for both commercial and residential use.

*Rayco* upon which it relies, does not constitute the decision of the court's majority.

There do exist a handful of cases from other jurisdictions that are more definitive than *Rayco* on the issue of whether a State may provide substitute property as a method of mitigating damages in eminent domain matters. In *Carillion Realty Corp. v. State*, 158 *Misc.*2d 810, 602 *N.Y.S.*2d 76 (Ct.Cl.1993), for example, the New York Court of Claims denied severance damages to a condemnee who refused to accept an easement over condemned property. *Id.* at 813, 602 *N.Y.S.*2d 76. The State had offered the easement to provide the condemnee with access to a main thoroughfare that his property had abutted prior to the taking. *Id.* at 811, 602 *N.Y.S.*2d 76. The Court found that the State possessed an implied power to provide substitute access to avoid paying severance damages. *Id.* at 814, 602 *N.Y.S.*2d 76.

The Kentucky Court of Appeals rendered a similar decision in *Board of Educ. v. Commonwealth Dep't of Highways*, 528 *S.W.*2d 657 (Ky.Ct.App.1975). In that case, the State condemned a school's playground to construct a highway. *Id.* at 657–58. The State presented witnesses who testified that the school could acquire adjacent property to replace the condemned playground. *Id.* at 659. The court of appeals affirmed the admission of evidence of the cost of acquiring this adjacent land as relevant to a determination of severance damages. *Ibid.* Also, in *Porrata v. United States*, 158 *F.*2d 788 (1st Cir.1947), the government offered to a condemnee property adjacent to the condemned property. *Id.* at 789. The District Court determined that the property owners would be justly compensated by accepting the substitute property plus a cash sum representing the balance of the value of the condemned property. *Id.* at 790. On appeal, the First Circuit was not required to affirm this aspect of the District Court's decision. *Ibid.*

■ Defendants contend that the mitigation theory espoused by the State is not sufficiently rooted in precedent to warrant acceptance by this court. Additionally, they urge that even if the

State's proposed theory were to be specifically sanctioned, laches and general principles of equity dictate that it should not apply in this case.  We find defendants' arguments persuasive.

Laches clearly applies here.  The State filed its declaration of taking and deposited its estimate of compensation, $165,000, on November 13, 1986.  The State made an additional deposit of $4,000.  Defendants immediately filed a notice to withdraw those deposited funds and did in fact receive those funds in January 1987.  The State acquired the Firth property in 1989.  In January 1992, the State revised its offer to defendants when it offered $117,000 *or*, in the alternative, $3,700 plus the Firth property valued at $114,000.

In *Lavin v. Hackensack Bd. of Educ.*, 90 *N.J.* 145, 447 *A.*2d 516 (1982), the Supreme Court said:

> Where it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where by his conduct and neglect he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted, in either of these cases, lapse of time and delay are most material.
>
> [*Id.* at 152, 447 *A.*2d 516 (quoting *Hall v. Otterson,* 52 *N.J.Eq.* 522, 535, 28 *A.* 907 (Ch. 1894)).]

"The length of delay, reasons for delay, and changing conditions of either or both parties during the delay are the most important factors that a court considers and weighs." *Ibid.*  Length of time alone may result in laches, but the real question is whether the delay has resulted in prejudice to the innocent party.  *Id.* at 152, 153, 447 *A.*2d 516.

Here, defendants have been prejudiced by the delay between the date of taking and the date when the State offered to convey the Firth property to them.  Defendants withdrew the State's deposits and assert they have expended those funds.  If defendants are required to accept the State's revised offer, with or without the Firth property, they will be required to return $52,000 to the State.  Every condemnee is aware of the risk that an ultimate condemnation award will be less than the sum deposited

by the condemnor. A condemnee is specifically apprised of that risk by the terms of an agreement binding him to repay any excess sum which is executed when deposited sums are withdrawn. *N.J.S.A.* 20:3-23. However, when defendants withdrew the deposited sums from the Clerk of the Superior Court, they were not aware that the State would thereafter acquire the Firth property and contend that defendants must accept the Firth property or its equivalent value as compensation. Clearly, defendants did not know, nor should they have known, of that potential risk when they withdrew the deposited funds.

■ We conclude that although as a general proposition, a condemnee has the duty to mitigate severance damages, a condemnee is not obligated to accept replacement land offered by the condemnor in lieu of just compensation where, as here, the condemnor does not own the replacement property as of the date of taking or does not apprise the condemnee that replacement property may be available as a form of compensation prior to the condemnee withdrawing the deposit. We therefore conclude that the trial judge correctly barred the State from introducing the replacement property as evidence of an attempt to mitigate damages. In light of our conclusion, we need not develop a standard which might be used in future eminent domain proceedings for the offer of replacement property to a condemnee.

### III

■ As noted in Part I of this opinion, the State's appraiser prepared his appraisal utilizing a valuation without consideration of damages attributable to a loss of visibility and a valuation which included damages attributable to loss of visibility. The appraisal ascribed a value of $7,800 per acre to the residential zoned portion of the property prior to the taking and a $7,500 value per acre after the condemnation.

The State introduced that testimony of its appraiser on a motion *in limine* out of the presence of the jury. The witness testified:

Essentially, by the taking the development of the residential tract has lost as I considered the advantage of having property along the major highway of Route 38 for exposure purposes. As a practical matter, the fact that it was located on Route 38, as I've seen in many instances, developers have utilized sample homes for display purposes and I felt that at least two dwellings could be placed on that site with appropriate advertising and exposed to the tremendous new traffic on Route 38 by reason of the improvement, changing it from a two lane to a four lane highway with ample side roads, that the developer would be able to sell off his residential tract more readily because it would be more readily exposed to the public by just driving by, coupled with the fact that he would not have to do extensive advertising as a lot of developers do when they have tracts back in the Pinelands or close to them and give you directions how to get there. And for that reason I felt that it added a measure of value to the property in the before. I, frankly, felt that that portion could be utilized if there was no taking.

The State then moved to strike the post-condemnation remainder reduced value. The trial judge denied that motion.

The question of whether diminution of visibility is an element of damages in a condemnation proceeding has not been directly addressed in any reported decision in this State. We note that in New York the courts have refused to award consequential damages because the owner's property is no longer visible to passing motorists. *Acme Theatres Inc. v. State,* 26 *N.Y.*2d 385, 310 *N.Y.S.*2d 496, 500, 258 *N.E.*2d 912, 915 (1970). On the other hand, California courts recognize that loss of view from the highway by reason of new construction is an element to be considered in a condemnation case. *People v. Lipari,* 213 *Cal.App.*2d 485, 28 *Cal.Rptr.* 808 (Dist.Ct.App. 4th Dist.1963); *People v. Ricciardi,* 23 *Cal.*2d 390, 144 *P.*2d 799 (Sup.Ct.Cal.1943). *See also* 2 *Nichols on Eminent Domain* § 5.72[1], n. 12 (3rd ed. 1970).

We think the facts of this case fall within a narrow exception to any rule which would prohibit an award of compensation for a diminution in visibility. We reach this conclusion by drawing an analogy to a similar exception which permits damages to a remainder resulting from a loss of access to an adjoining public thoroughfare.

The principle is generally accepted that a "property owner is not entitled to access to his land at every point between it and the highway but only to 'free and convenient access to his proper-

ty and the improvements on it.'" *High Horizons Dev. Co. v. Department of Transp.*, 120 *N.J.* 40, 48, 575 *A.*2d 1360 (1990) (quoting *Mueller v. N.J. Highway Auth.*, 59 *N.J.Super.* 583, 595, 158 *A.*2d 343 (App.Div.1960)). *See also Commissioner of Transp. v. National Amusements, Inc.*, 244 *N.J.Super.* 219, 581 *A.*2d 1353 (App.Div.1990), *certif. denied*, 127 *N.J.* 327, 604 *A.*2d 601 (1991); *State v. Charles Investment Corp.*, 143 *N.J.Super.* 541, 363 *A.*2d 944 (Law Div.1976), *aff'd o.b.*, 151 *N.J.Super.* 14, 376 *A.*2d 534 (App.Div.1977), *aff'd o.b.*, 76 *N.J.* 86, 385 *A.*2d 1227 (1978); *Lima & Sons, Inc. v. Borough of Ramsey*, 269 *N.J.Super.* 469, 635 *A.*2d 1007 (App.Div.1994).

These principles were reviewed by in *State by Comm'r of Transp. v. Van Nortwick*, 260 *N.J.Super.* 555, 558, 617 *A.*2d 284 (App.Div.1992) (*Van Nortwick I* ) and most recently in *State by Comm'r of Transportation v. Van Nortwick*, 287 *N.J.Super.* 59, 670 *A.*2d 548 (App.Div.), *certif. denied*, 143 *N.J.* 320, 670 *A.*2d 1061 (1995) (*Van Nortwick II* ). In *Van Nortwick II*, we commented:

> In *State by Comm'r of Transp. v. Van Nortwick*, 260 *N.J.Super.* 555[, 617 *A.*2d 284] (App.Div.1992), we held the trial judge's failure to exclude evidence of the diminution of access to a fronting highway as an element of damages was reversible error. There, we were confronted with the question of whether the diminution of access is compensable in the context of a partial taking where the remaining access is reasonable. We determined that it was not compensable, reversed the judgment in favor of defendant and remanded the case for trial. In that context, we observed as dicta, that "a diminution of access may cause other conditions on the property itself which may be compensable, as for example, . . . such things as limitation of design options or on-site maneuverability, [as long as the remaining access is reasonable, the diminution *per se* is not compensable.]"
>
> [*Id.* at 62, 670 *A.*2d 548 (quoting *Van Nortwick I, supra*, 260 *N.J.Super.* at 558, 617 *A.*2d 284) (emphasis added).]

In *Van Nortwick, II*, on appeal following our remand is *Van Nortwick I*, we defined the issue on appeal as "whether a property owner is entitled to just compensation for on-site damages to his remaining property caused by the manner in which his access was limited." *Id.* at 70–71, 670 *A.*2d 548. We concluded that a condemnee is entitled to compensation. *Id.*

Here, the State's appraiser recognized that defendants intend to develop the residential portion of their property, the remainder

subsequent to the condemnation, into single-family residential home-building lots. The State's appraiser recognized in his appraisal that the loss of frontage, although not depriving defendants of reasonable access to Route 38, would deprive defendants of the opportunity to market the remaining portion of residentially zoned land in the same manner that the property could be marketed but for the condemnation. With highway frontage a developer is able to construct a sample home adjoining the highway which itself promotes and advertises the presence of a residential development in the interior portion of the property. The absence of highway frontage deprives the developer of that advertising and marketing technique and will require the developer to devote capital for advertising to overcome the absence of visibility.

The opinion of Borden, the State's appraiser, was also shared by defendants' experts. One expert, Stephen Segal testified as follows:

Q. Secondly, you heard Mr. Borden testify about the advantage that one would have if one could put sample homes out on Route 38 which would have some promotional and advertising value. Were you here when he gave that testimony?

A. Yes, I was.

Q. Do you agree with Mr. Borden that that is a factor to be considered in the before and after condition?

A. In the early stages of development it's very important because it's a show case on a very heavily travelled major artery.

Q. Did you also hear the testimony of Mr. Ritter [defendants' other expert] in this case with regard to the developmental expenses being increased as a result of having to provide access only from the westerly side of the property rather than the lower or easterly end of the property?

A. Yes, I did.

Q. Was that something that is a factor in determining the after value?

A. Well it's a contributing factor because the greater the expense to the developer, the less he's in a position to pay for a portion of unimproved land prior to embarking on the development process. Nothing's been done to the property so you have to view it as a developer would look at it as a competitor in the marketplace.

We think it is clear that the loss of visibility resulting from the State's condemnation will have a direct effect upon development expenses pertinent to marketing. To the extent that the property value after condemnation is affected by that increase in marketing

costs, the property owner has been damaged. An increase in market and advertising expense is similar, we think, to limitations of design options, to which we referred in *Van Nortwick I.* Those damages, although attributable to loss of visibility, are recoverable. The trial judge recognized this distinction and properly permitted both appraisers to testify to that effect at trial. Although Mr. Borden's opinion was not extremely articulate, in the context of the entire trial and the theory of the case presented by defendants, the conclusion is clear that permitting the jury to hear that testimony in this particular case was proper.

The trial judge made appropriate reference to the distinction between an award of damages for loss of visibility, which are not permitted, and damages to the remainder by way of increased development costs, attributable to a loss of visibility, which are permitted, in view of our comment in *Van Nortwick I.* Specifically the court charged, "You may consider whether the taking caused a reduction in the total number of lots and the *cost of developing* them." (emphasis added). Obviously, the reference to development costs was a reference to the expert's opinion in light of *Van Nortwick I.*

We affirm the judgment.