136 N.J. Super. 148 (1975)
345 A.2d 329
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-RESPONDENT,
v.
JULIUS STULMAN, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1974.
Decided July 2, 1975.
*150 Before Judges KOLOVSKY, LYNCH and ALLCORN.
Mr. Philip R. Carlin argued the cause for appellant Stulman (Messrs. Goldberg & Carlin, attorneys).
Mr. Julius Stein argued the cause for appellant Airport Interchange Properties, Inc.
Mr. Richard L. Rudin, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney *151 General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by KOLOVSKY, P.J.A.D.
Prior to the institution of these condemnation proceedings in March 1967, the New Jersey Department of Transportation and the New Jersey Turnpike Authority in cooperation had undertaken the substantial work involved in, among other things, the improvement and enlargement of ramps appurtenant to a state highway (Routes 1 and 9), the construction of part of new State Highway 78 and of new access roads, and the enlargement of the Turnpike's access facilities and plaza. A number of toll booths were to be added to the existing toll booths located at the easterly end of the Turnpike's plaza which itself lay to the southeast of the property owned by defendant Julius Stulman.
The complaint filed by plaintiff State Commissioner of Transportation sought to obtain title to 3.843 acres of the 9.2347-acre tract owned by Stulman, as well as specified rights in his remaining property, for grading of two roads designated as "Frontage Road" and "Road to Motel," the construction and maintenance of a headwall, subsurface drains and appurtenances and a temporary road. Also to be taken was the "owner's right of direct access to and from the Freeway, except that the owner shall have the right of direct access to and from the Frontage Road as far as the line marked `Limit of Access.'"
Joined as parties defendant to the original complaint were only Mr. and Mrs. Stulman, the bank holding a mortgage on the property, a tenant of part of the property, the State by reason of franchise tax liens, the City of Newark by reason of real estate tax liens and United New Jersey Railroad and Canal Company, described as
[the] successor of The New York Bay Railroad Company, a corporation of New Jersey, by merger February 29, 1956, which by reason *152 of a reservation of a roadway in the deed from The New York Bay Railroad Company, a corporation of New Jersey and The Pennsylvania Railroad Company, a corporation of Pennsylvania, to Newark Airway Terminal, a corporation of New Jersey, dated October 6, 1952, recorded in said Essex County Register's Office December 10, 1952 in Book 3094 of Deeds at Page 10, has or may claim to have an interest therein.
Thereafter, by two amendments of the complaint, Merit Realty Co., Airport Interchange Properties, Inc., Bay Avenue Corporation and M & F Service Corporation, owners of neighboring properties, were added as parties defendant by reason of their status as holders of rights of way easements as set forth in four specified deeds.[1]
On appeal by both plaintiff and defendants from an award made by condemnation commissioners, the jury found that the value of the land and other property rights taken and the damages sustained by the property to which Stulman still retained title totalled $440,500. Defendants Stulman and Airport Interchange Properties, Inc. (Airport) join in an appeal to this court.
Prior to the taking the westerly line of the Stulman tract, 797 feet in length, ran along the easterly line of a ramp leading to an existing state highway (Routes 1 and 9). The ramp began at a point southwest of the southwesterly corner of the Stulman tract. The line separating the ramp and the Stulman property was at the bottom of the fill on which the ramp was constructed, fill which was three feet *153 high at the southwest corner of the Stulman property and rose to a height of 21 feet at its northwest corner.
The northerly line of the Stulman tract was about 544 feet long, its easterly line 587 feet long and its southerly line 634 feet long. The southerly line was also the northerly line of lands belonging to the New Jersey Turnpike Authority, with "a span of vacant land" extending from that line a distance of about 150 feet to a paved road which ran in a westerly direction from the plaza on which were located the Turnpike's toll booths.
The 3.8 acres taken by the State consisted of a parcel of land roughly L-shaped. It included substantially all of the most westerly 116 feet of the Stulman property and the southerly portion thereof to a depth which varied from about 100 feet to 200 feet.
As we note later, there then existed a 20-foot paved roadway which is delineated on a survey or map made by Clarke & Hartman, surveyors, in two sections, Route A and Route B. Route B ran in an east-west direction across the southerly portion of the Stulman tract taken by the State. It also extended in a southwesterly direction beyond the westerly line of the Stulman tract a distance of some 135 feet to the foot of the adjoining ramp. It also extended, beyond the easterly line of the Stulman tract, into lands of the United New Jersey Railroad and Canal Company (United) and then curved, to form the section referred to as Route A, running northerly through United's lands and southerly through lands of United and of the New Jersey Turnpike Authority to the Turnpike's plaza.
Route B furnished a means of ingress from the foot of the above-mentioned ramp across properties belonging to the Turnpike and the State into the Stulman property and through it, by means of Route A, to the several properties  including that of appellant Airport Interchange Properties, Inc. (Airport)  lying to the east and north of Route A.
*154 Route A furnished a means of egress in a southerly direction from those properties and the Stulman property into the Turnpike's property at a point beyond the plaza proper, thus permitting use in a westerly direction of a road running from the Turnpike plaza  a road which according to Stulman's expert is "sometimes called Port Street at that point." One using the latter road could then, at points lying southeast of the southwest corner of the Stulman property, either (1) turn therefrom in a northerly direction to the foot of the ramp above-mentioned and then proceed up the ramp or into the Stulman property, or (2) turn in a southerly direction into the "Airport traffic circle" and proceed around it to reach the entrance toll booths of the Turnpike, or (3) continue westerly on a narrower road leading under State Highway 1 and 9.
As the result of the taking, and a deed dated December 9, 1966 by which United conveyed to the State adjacent lands and an easement over lands which form part of two 50-foot-wide roads thereafter constructed by the State, Route B and the southerly one-third of Route A were eliminated. One of the new roads, designated as "Frontage Road," begins at a point in the westerly line of the portion of the Stulman tract which was not taken and then runs adjacent to Stulman's present property in a northerly direction some 375 feet to the property's northerly line, where it turns to the west and runs under Highway 1 and 9 to connect with a series of highways. The other road, designated as "Road to Motel," starts at the northerly terminus of the preexisting 20-foot paved roadway shown as Route A and then runs westerly along Stulman's northerly line to join with the "Frontage Road" at the westerly line of the remaining Stulman property.
Access to those roads, both for ingress and egress, is available to Airport by use of the 20-foot roadway which adjoins its property. Access to those roads, both for ingress and egress, is available to the remaining Stulman property *155 at points in its westerly and northerly boundaries which adjoin, respectively, the "Frontage Road" and the "Road to Motel."
The new roads permit access to the several highways in the area and to the enlarged Turnpike plaza albeit, in some instances, by more circuitous routes than formerly were available.
The trial judge left to the jury for resolution the factual issue of whether or not Stulman was left with reasonable access to his remaining lands, adding that:
If you [the jury] determine that reasonable access has been denied to the property owner by reason of the taking, the owner of course, is entitled to be compensated for such loss of access.
While appellant Stulman does not complain of that portion of the charge, he criticizes the first and second paragraphs of the following portion of the judge's further charge that:
* * * any change in the highway system or traffic patterns or in the ease of traveling to or from any place in or on the highway system  to or from any place in or on the highway system to or from the Stulman property after the taking, as may be shown by these exhibits and testimony, and which has from time to time been referred to as circuity of access, circuity of travel, reachability and words of similar character, may not be considered by you as an element of damage which the property owner may have sustained from the taking of a portion of the property, and you may not make any award of damages on the basis of these elements.
An abutting land owner has no vested right or interest in traffic patterns or the flow of traffic past his premises, and any damages that may have been sustained because of a possible diversion of traffic or change in traffic patterns does not constitute an element of damage to the land remaining after the taking and is not compensable and you may not make any award in this case on that basis.
On the other hand, benefits, if any, resulting from the changes in highway systems and traffic patterns at or near the Stulman property may not be considered by you to reduce any damages which the property owner may have sustained from the taking of a portion of its property. *156 He argues that under the circumstances of this case he was entitled to compensation by reason of his alleged "loss of accessibility." We disagree. The charge accorded with settled law. State v. Monmouth Hills, Inc., 110 N.J. Super. 449 (App. Div. 1970), certif. den. 57 N.J. 133 (1970); State Highway Comm'r v. Kendall, 107 N.J. Super. 248, 252 (App. Div. 1969); Tubular Service Corp. v. Comm'r State Highway Dept., 77 N.J. Super. 556 (App. Div. 1963), aff'd o.b. 40 N.J. 331 (1963); State v. Interpace Corp., 130 N.J. Super. 322 (App. Div. 1974).
A separate and distinct issue is presented by the contention advanced by both Stulman and Airport that their right to use the 20-foot paved roadway for ingress from the foot of the ramp, a point southwest of the Stulman property, and for egress to the Turnpike plaza, existed by reason of private easements of right of way adhering to their respective properties  which included in Airport's case, a right of way over the Stulman property  and that they are entitled to be compensated for the loss of those private easements.
The trial judge, both before and at the trial, ruled that the sole issue to be tried was the value of the land taken and the damage to the remainder. Cf. State v. New Jersey Zinc Co., 40 N.J. 560, 570 (1963). In his view that issue did not call for a determination of whether or not the claimed private easements existed; if Airport had an easement over the Stulman property, it would be compensated therefor out of the condemnation award; if, as Stulman and Airport claimed, they held easements of right of way over properties belonging, respectively, to the New Jersey Turnpike Authority and The United New Jersey Railroad and Canal Company, the servient estates, loss of those easements was compensable, if at all, only in condemnation proceedings involving the servient estates.
For the reasons set forth in State v. Orenstein, 124 N.J. Super. 295 (App. Div. 1973), certif. den. 63 N.J. 588 (1973), decided after the trial of the instant matter, the *157 trial judge's rulings were incorrect. In Orenstein we held that a landowner who claims that the condemning authority is in fact taking, in addition to the land described in the complaint, an irrevocable appurtenant easement of right of way over adjacent lands, must present that claim to the court before entry of the order appointing commissioners. That course is essential so that, if the contention is found by the court to be meritorious, the complaint may be amended to include the easement in the description of the land and property rights being condemned. If that course is followed, then the condemnation commissioners, and on appeal the jury, would consider the value of the easement in determining the compensation to which the landowner is entitled.
Further, we ruled in Orenstein that when the property being condemned (the servient estate) is subject to an irrevocable right of way easement for the benefit of adjacent property (the dominant estate), the adjacent landowner thus deprived of his easement is entitled to a separate award therefor. It may not be required to seek compensation out of the lump sum awarded for the taking of the servient estate. We adopted the rule set forth in Jahr, Eminent Domain, Valuation and Procedure, § 160 at 251 (1953), as follows:
If land burdened with an easement is taken by eminent domain, the owner's measure of damage is the market value of the land as affected by the easement. The easement itself attaches to the land of the owner of the dominant fee and is appurtenant to his land, and must be valued with reference to it and not as though the easement constituted a separate entity. The owner of the dominant estate must be compensated for the value of the easement taken from him and the measure of damage is the difference in the market value of the dominant estate with the easement and its value without the easement.
Nevertheless, the erroneous rulings made by the trial judge would call for a reversal only if in fact Stulman and Airport's rights to use the 20 foot right of way, Routes A and B, were irrevocable and the substitution therefor of the new means of access  the Frontage Road and the Road to Motel  *158 not authorized by the easement grants upon which they rely. We may ignore, for the purposes of consideration of that issue, the procedural deficiencies in the manner in which appellants sought to project the issue and their failure to proffer, instead of oral representations, the best evidence with respect to those alleged easements, the deeds creating or recognizing them.
However, an analysis of those deeds is essential to a determination of the issues presented, the rights of the parties and the prejudice, if any, resulting from several rulings in the trial court. We therefore directed that we be furnished with copies of the deeds which created or recognized the easements so that we might ascertain exactly what easement rights were created thereby. The deeds have been furnished to us.
The first reference to the 20-foot roadway is found in a deed dated October 6, 1952 from The New York Bay Railroad Company and its lessee, The Pennsylvania Railroad Company (the railroads), conveying the 9.2347-acre tract to Newark Airway Terminal. (Newark Airway Terminal conveyed the same tract to Stulman on April 22, 1964.)
Attached to the deed of October 6, 1952 was the Clarke & Hartman survey on which the 20-foot roadway described above was shown as Routes A and B. Although, as shown on the survey, both the westerly end of Route B and the southerly end of Route A extended into and upon lands owned by the Turnpike Authority, neither the deed nor the survey indicates any authority for such extensions.
It is apparent from the several deeds submitted that both Routes A and B were constructed by The New York Bay Railroad Company. So much of Route B located within the Stulman tract was constructed pursuant to the following reservation set forth in its deed of October 6, 1952 to Newark Airway Terminal:
RESERVING, however, unto the said party of the first part [The New York Bay Railroad Company], its successors and assigns, the *159 full and free right, liberty and privilege of constructing a roadway, which roadway is specifically outlined on the aforementioned survey made by Clark and Hartman, January 2nd, 1952, over and across the southwesterly portion of the parcel of land hereinbefore described and of using the same as and for a means of ingress, egress and regress to and from remaining land of the party of the first part; and the said party of the first part hereby covenants, for itself, its successors and assigns, that after said roadway is constructed, it or they will, at their sole cost and expense, maintain and keep the same in proper repair so long as said roadway is used by them, and until this easement is finally and formally surrendered by an instrument properly executed and in form for recording.
The portions of Routes B and A lying within the lines of the Stulman tract and those of the railroad's own property would not in themselves furnish access to public roads; they "dead-end" at the property lines. Those portions of the roadway and the easements to use them were worthless and ineffective unless and until permission was obtained from the Turnpike Authority to permit Route B to extend southwesterly beyond the Stulman tract to the foot of the ramp leading to State Highway 1 and 9 and to permit Route A to extend southerly into the Turnpike's property.
In fact, such permission did not appear of record until the recording of a "corrective deed" dated March 1, 1961 executed by United New Jersey Railroad and Canal Company (as successor to the New York Bay Railroad Company), by its lessee, The Pennsylvania Railroad Company and by the New Jersey Turnpike Authority. The deed recited that while a deed of October 23, 1951 from the railroads to the Turnpike, transferring title to the property lying south of the Stulman tract and the adjacent railroad lands, had expressly prohibited any "direct passage or access" into the property conveyed to the Turnpike Authority, it was in fact intended "to provide a limited right of access, as hereinafter recited," to the railroads, its successors and assigns; and that
WHEREAS, it was then, and still is the intent of the parties that access to Port Street and State Highway 25 [now 1 and 9] would *160 be reserved to [the railroad], its successors and assigns; this Deed is executed for the purpose of correcting the said mistake.
The corrective deed of March 1, 1961 then repeats the description of the large tract and other property rights conveyed to the Turnpike Authority by the railroad's original deed of October 23, 1951.
It also repeated the bar of direct access or passage onto the Turnpike Authority's lands but then continued with the following paragraphs:
RESERVING HOWEVER, unto the [railroad], its successors and assigns, vehicular egress from the present road (designated as Route A on the attached map) located on lands of the [railroad] to Port Street and State Highway [1 and 9] and vehicular ingress from Port Street and State Highway Route [1 and 9] to property of the [railroad] via the road (designated as Route B on the attached map) located on lands of the [railroad]; said roads being shown as Routes A and B respectively on the attached map, Exhibit A entitled "Survey at Newark, N.J. for the Pennsylvania Railroad Company, Signed: Clarke & Hartman 2 Jan., 1952, Amended: 1 Dec., 1952, No. 21989." Said access roadways shall be limited to 20 feet in width.
IT BEING UNDERSTOOD AND AGREED, however, that the [Turnpike Authority] reserves the right to alter, revise, remove and relocate the existing ingress and egress from and to the Turnpike Toll Plaza; provided however, that in so doing, the [Turnpike Authority] shall relocate, or cause to be relocated, if necessary, existing roads A and B and extend them to maintain connections with Port Street and Route 25 (U.S. Highway No. 1). The size, width and capacity of each relocated road shall be equal to the road it replaces.
The manner, means, location and design of the relocated access referred to above, shall be as determined in the sole judgment of the [Turnpike Authority] and as deemed necessary by the reconstruction, enlargement, alteration, modification or extension of the New Jersey Turnpike and its facilities; at no cost or expense to the [railroad] and without payment of any damages or costs to or on behalf of the [railroad], its successors and assigns, for any reason whatsoever.
In view of the provisions of the last two quoted paragraphs, neither Stulman nor Airport[2] was deprived of property *161 rights by reason of the elimination of the preexisting rights of ingress and egress over Routes B and A, respectively, and the substitution of rights of access over the Frontage Road and Road to Motel. Their claim for damages for alleged loss of easements is therefore without foundation.
It is clear that "if the language of an express grant or reservation of an easement authorizes it, the location of the easement may be changed in accordance with the agreement." 25 Am. Jur.2d, Easements and Licenses, § 69 at 477; see also Jaqui v. Johnson, 27 N.J. Eq. 526, 531 (E. & A. 1875).
Here, the relocation of appellants' means of ingress and egress to and from public roads, resulting from the alteration, revision and expansion of the Turnpike's facilities and the roads serving those facilities, was expressly authorized by the terms of the easement agreement. The only limitation on the right to effect such relocation was that the "size, width and capacity of each relocated road shall be equal to the road it replaces," a requirement obviously satisfied by the two new roads, each 50 feet in width as contrasted with the 20-foot width of the replaced roads, Routes A and B.
The trial judge's decisions barring appellants' attempts to show damages resulting from the loss of their easements over Routes A and B were therefore correct, albeit for reasons other than those given for the decisions.
The remaining points advanced on appeal by Stulman do not require any extended discussion since we are satisfied that none of them afford any basis for reversal.
On the record here, there is no merit to Stulman's contention that "the question whether relocation of the Newark Airport main passenger terminal is part of a single project *162 for which the subject property was taken is a factual question to be presented to a jury." State v. Jones, 27 N.J. 257 (1958), upon which he relies, is clearly inapposite.
Nor is there any substance to the arguments, presented without citation of any supporting authorities, that (1) although concededly the general rule is that "temporary upset" is not compensable, here compensation therefor should have been awarded, and (2) he is entitled to compensation for the alleged loss of visibility of his property resulting, not from the partial taking, but from the construction of the new network or complex of highways on property formerly belonging to others. Cf. Public Service Elec. & Gas Co. v. Oldwick, 125 N.J. Super. 31 (App. Div. 1973), certif. den. 64 N.J. 153 (1973).
It may be noted that defendant was permitted to develop, during the examination of his expert witness, that the value of the property as a motel site had been diminished because of the change in the shape of the plot and the fact that a motel would have to face the rear of the property instead of the Turnpike, thus allegedly making it less prominent.
Appellant also challenges five evidential rulings made by the trial judge, but we find no error or abuse of discretion in any of those rulings.
Stulman's final contention is that he is entitled to a new trial because of allegedly improper statements made by plaintiff attorney in his closing statement to the jury. No objections to those statements were interposed when they were made; instead, defendant moved for a mistrial at the conclusion of plaintiff's summation. The trial judge denied the motion.
The judge's ruling was proper. While some of the statements made were unduly harsh, and undoubtedly induced the harsh comments in the same vein during defense counsel's summation, no real prejudice resulted. Particularly is this true because the case was submitted to the jury *163 following a clear and comprehensive charge in which the judge emphasized that the jury was the "sole and exclusive judges of the facts" and should disregard statements as to facts made by counsel and, indeed, by the judge himself, if those statements did not coincide with the jurors' own recollection of the evidence.
The judgment is affirmed.
NOTES
[1] To the extent pertinent, the deeds will be discussed later. They are: (a) deed from The United New Jersey Railroad and Canal Company to Merit Realty Co., dated September 25, 1961, recorded in Book 3831, p. 51; (b) deed from Merit Realty Co. to Airport Interchange Properties, Inc., dated September 30, 1963, recorded in Book 3971, p. 375; (c) deed from The New York Bay Railroad Company and The Pennsylvania Railroad Company to Bay Avenue Corporation, dated December 28, 1953, recorded in Book 3195, p. 261; and (d) deed from the United New Jersey Railroad and Canal Company to M & F Service Corp., dated February 15, 1961, recorded in Book 3779, p. 176.
[2] Following receipt of the corrective deed embodying the easement over the Turnpike lands, United, by deed dated September 25, 1961, granted Merit Realty Co.  to which it had theretofore conveyed lands which include those now owned by Airport  the right to use Routes A and B. Merit's deed to Airport is dated September 30, 1963.