693 A.2d 864

STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANS-PORTATION, PLAINTIFF–APPELLANT, v. FRED WEISWAS-SER AND GERALDINE WEISWASSER, DEFENDANTS–RE-SPONDENTS, AND TOWNSHIP OF HAINESPORT, IN THE COUNTY OF BURLINGTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.

Argued November 19, 1996—Decided May 20, 1997.

322

*George P. Ljutich,* Deputy Attorney General, argued the cause for appellant (*Peter G. Verniero,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel).

*S. David Brandt* argued the cause for respondents (*Brandt, Haughey, Penberthy, Lewis & Hyland,* attorneys; *Donald M. Doherty, Jr.,* on the brief).

The opinion of the court was delivered by

HANDLER, J.

In this case, the State of New Jersey condemned a small section of a large tract of undeveloped property fronting on a major highway. As a result of the partial taking, the property owners lost their widest stretch of contiguous highway frontage.

In the course of extended settlement negotiations, prolonged pretrial proceedings, a commissioners' hearing with an award of compensation, and pretrial motions for evidentiary rulings, the parties raised arguments over the admissibility of evidence that present issues to be determined on this appeal. Those issues are whether, in determining just compensation in a partial-taking condemnation case, (1) evidence of damages, or the mitigation thereof, may include the availability and value of replacement property; and (2) severance damages may include the loss of visibility of the remainder property as a result of reduced highway frontage.

I

The property that is the subject of this condemnation action is located in Burlington County and is owned by defendants, Fred and Geraldine Weiswasser. They bought the property as an investment and planned to develop it. The property consisted of 112.38 acres of undeveloped land, which had road frontage on Route 38 and on Bullshead Road. The sections of the property fronting on Route 38 were approximately 110 feet, 54 feet, 278.5 feet, and 62 feet in width. The property between the 278.5 foot

frontage and the 62 foot frontage sections was a 0.37 acre parcel owned by third parties, the Firths. The frontage on Bullshead Road is approximately 135 feet wide and three to four feet below the road grade. Approximately 19 acres of the Weiswasser property located within five hundred feet of Route 38 were zoned for commercial use. The bulk of the Weiswasser property, approximately 93.38 acres, was zoned for residential use. Although defendants had never applied for access permits, access would have been permitted at all points of frontage.

The State took a 0.39 acre crescent-shaped section of the Weiswasser property in fee simple to construct a jughandle on Route 38. It also acquired a slope easement over a 0.105 acre band of property surrounding the section taken in fee simple. The section taken included 255 feet of frontage from the property's largest section on Route 38, thereby reducing the width of that section along the highway from 278.5 feet to approximately 24 feet. As a result of the taking the owners were effectively left with only three sections of frontage on Route 38, of widths of 62, 54, and 110 feet, respectively, and the 135 foot stretch of frontage on Bullshead Road.

The State filed a Complaint in Condemnation on October 15, 1986, and offered the Weiswassers $165,000 as compensation. The Weiswassers rejected that offer. The State then deposited $165,-000, its estimate of just compensation, with the court and filed a Declaration of Taking on November 13, 1986. On January 8, 1987, the court entered a final judgment on the State's exercise of its eminent domain power and appointed commissioners to determine just compensation. The State later revised its estimate upward and deposited an additional $4,000 with the court on February 10, 1988. The Weiswassers withdrew those sums from the court, having filed a consent to entry of judgment in the event that the money withdrawn exceeded the amount to which they were ultimately held entitled. *See N.J.S.A.* 27:7–22.

The commissioners' hearing was held on April 5, 1988. The State's expert was John Borden, who testified that the value of the

property taken and damages to the remainder combined were $169,000. Fred Weiswasser testified that just compensation would be $604,000. The commissioners awarded the Weiswassers $390,-000 as just compensation.

Subsequent to the hearing, on October 18, 1988, the State proposed to the Weiswassers to resolve the suit through the purchase by the State of the Firth property. Its northern edge has 150 feet of frontage on Route 38; its eastern edge is contiguous with the 62–foot wide leg of the Weiswasser property, and its western edge is contiguous with the 24 feet of frontage of the Weiswasser property remaining after the taking; the Firth property thus is surrounded on three sides by the Weiswasser property, with the fourth side fronting on Route 38. The addition of the Firth property to the remainder therefore would provide the Weiswassers with a 236 foot stretch of frontage on Route 38. The parties apparently negotiated over the Firth property, but did not reach any settlement.

Thereafter, on March 9, 1989, the Weiswassers submitted an appraiser's report and a planner's report to the State. According to the appraisal of Stephen Segal, prior to the taking, the "highest and best use" of the property was for a mixed-use development with five acres for commercial uses and 107.38 acres for single-family residential development; it would have been possible to construct "a high-quality, median[-]divided, tree-lined development entrance road, thereby creating a proper 'gateway' for the residential community that is beyond the commercial frontage." Segal valued the five-acre commercial section at $65,000 per acre, and the residential section at $8,000 per acre before the taking. He found that as a result of the taking, "[n]o commercial development could be market[-]supported without sufficient frontage on Route 38." He therefore valued the remaining "commercial" land as residential. Segal also concluded that the residential section had dropped in value from $8,000 to $7,000 per acre as a result of the taking. He concluded:

The diminished frontage on Route 38 and potential loss of access has reduced the marketability for residential development and has decreased the value of the residential land.

Segal assigned damages in four parts: $25,350 to the property taken (0.39 acres @ $65,000 per acre), $267,380 to the commercial remainder reduced to use for residential purposes (4.61 acres @ $58,000 per acre), $107,380 to the reduced worth of the residential remainder (107.38 acres @ $1,000 per acre), and $200 for the value of the slope easement taken by the State. These damages resulted in his total of $400,300, of which $374,960 represented severance damages to the 111.99 acre remainder.

On September 21, 1989, the State brought a motion to exclude the damages contained in the Segal appraisal that compensated for the reduced potential access to the remainder caused by the taking; in the alternative, it sought leave to amend its complaint to permit the acquisition of the Firth property as compensation to the Weiswassers. On November 30, 1989, the court determined as a matter of law that there was reasonable access to the residentially zoned portion of the remainder property (93.3 acres) and that the issue of reasonable access to the approximately 19 acres zoned "AC Residential/Commercial" was a question of fact. Accordingly, the court allowed the State to amend its complaint to show, as evidence of just compensation, the acquisition of the Firth property to replace the frontage lost as a result of the taking. The State then made an offer of $83,000 for the Firth property, pursuant to *N.J.S.A.* 20:3–6, under which the offer can be no less than the "approved appraisal of the fair market value of [the] property." On January 10, 1990, the State purchased the Firth property for $84,000. According to the State, the purpose of the purchase of the Firth property was both to replace the frontage lost by the Weiswassers due to the taking, and to cure the severance damages testified to by Fred Weiswasser and Stephen Segal.

The Weiswassers brought a motion for reconsideration of the November 30, 1989, order permitting the State to introduce evidence of the purchase of the Firth property as a partial

measure of just compensation. The court granted that motion on January 15, 1990. The court reasoned that under the Eminent Domain Act, the State had an obligation to propose to the Weiswassers the purchase of a third-party tract at the time of the initial offer and then to negotiate in good faith on that basis. Because the Firth property was not offered to the Weiswassers until late 1988, the court ruled that the State would be barred from introducing evidence of such a purchase.

On January 30, 1992, the State presented the Weiswassers with a new appraisal and formally revised its offer, revaluing just compensation at $117,700, or, in the alternative, the Firth property plus $3,700. The State's new valuation was based on an appraisal by Joseph Manzi, who concluded that the 0.37 acre Firth property plus an additional $3,700 would make the Weiswassers whole as of the date of the taking. The State valued the Firth property at $114,000 by adding to the purchase price of $84,000 its costs of $30,000 to clean-up the property and to restore it to an undeveloped state. The State's offer stated that the Firth property would be "conveyed as vacant land with all improvements and environmentally hazardous materials removed...." The additional $3,700 was to compensate for the 0.105 acre slope easement and for the 0.02 acre land differential between the 0.39 acre parcel taken and the 0.37 acre Firth property.

Subsequent to this offer, the parties negotiated the issue of just compensation. Those negotiations included discussions regarding the transfer of the Firth property, valued at $84,000.[1] The Weiswassers requested a hearing, which the court treated as a motion on the admissibility of the State's new valuation evidence. On August 28, 1992, the court ruled that the State would be precluded at trial from introducing its purchase of the replace-

---

[1] The State's offer would have required the Weiswassers to return $84,000 of the $169,000 previously withdrawn from the court; in return, the Weiswassers would receive the Firth property and would be permitted to keep $85,000 of the $169,000 estimate of just compensation.

ment property as evidence of just compensation. Again, the parties were unable to reach any settlement.

The trial commenced on April 25, 1994. The primary evidence presented by the Weiswassers was the testimony of Segal based on his appraisal. The State relied primarily on Borden as its expert. His appraisal contained two values for just compensation, $204,000 and $169,000. (The lower valuation was based on an instruction from a Deputy Attorney General who informed Borden that it was improper for him to consider the effect of lost highway visibility in calculating damages to the remainder. Borden testified at the Commission hearing only as to the lower valuation.) Borden stated that before the taking the property had a value of $1,044,000. He found the highest and best use of the property before the taking to be development of the rear land for residential purposes and development of the highway frontage land for commercial purposes. He determined 1.1 acres to be commercial property, worth $174,000. He valued the remaining 111.28 acre residential property before the taking at $7,800 per acre, for a value of approximately $870,000. He testified that as a result of the taking no property remained suitable for commercial purposes, and included as residential 0.71 acres that he considered as commercial prior to the taking (1.1 commercial acres minus the 0.39 acres taken by the State). He considered the entire 111.99 acre remainder as usable for residential development, which he valued at $7,500 per acre, totalling approximately $840,000. The difference between the before-taking figure, $1,044,000, and the after-taking figure, $840,000, equals Borden's appraisal of $204,000 in damages. That figure includes the finding that the original residential property had incurred a loss of $300 per acre, from $7,800 per acre to $7,500 per acre, leading to an additional loss of approximately $33,600. That sum substantially accounts for the $36,000 difference between the $204,000 and $169,000 figures. Borden explained that in his higher valuation he had included the increase in development costs due to the Weiswassers' inability to exhibit model homes within view of Route 38 because the taking

deprived them of their only frontage sufficiently large for that purpose.

The jury award of just compensation in the amount of $204,000 was appealed by the State and cross-appealed by the Weiswassers. The Appellate Division affirmed the jury verdict. 287 *N.J.Super.* 287, 671 *A.*2d 121 (App.Div.1996). In denying the State's appeal, the cross-appeal, by stipulation, became moot and was dismissed. This Court granted the State's petition for certification. 145 *N.J.* 373, 678 *A.*2d 713 (1996).

## II

■ Property owners are entitled to just compensation for land taken in condemnation. *State v. Silver*, 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983); *see U.S. Const.* amend. V; *N.J. Const.* art I, ¶ 20; *N.J.S.A.* 20:3–29. This Court has determined that "where only a portion of a property is condemned, the measure of damages includes both the value of the portion of land actually taken and the value by which the remaining land has been diminished as a consequence of the partial taking." *Silver, supra,* 92 *N.J.* at 514, 457 *A.*2d 463. One of two formulas may be used to calculate just compensation in a partial-taking case. The first measures damages as "the market value of the land taken plus the difference before and after the taking in market value of the remainder area." *Ibid.* (quoting *Village of South Orange v. Alden Corp.,* 71 *N.J.* 362, 367, 365 *A.*2d 469 (1976)) The second sets damages as "the difference between the value of the entire tract before the taking and the value of the remainder area after the taking." *Ibid.* (same).

The issue raised by the State's offer is whether, in determining severance damages, there is a duty to mitigate damages, and, if so, whether that duty includes a duty to accept substitute or replacement property or its monetary equivalent in measuring the value of the property taken.

The duty to mitigate damages is most traditionally employed in the areas of tort and contract law. *See White v. Township of N.*

*Bergen,* 77 *N.J.* 538, 546, 391 *A.*2d 911 (1978) (stating that, in tort action, " '[m]itigation of damages' is defined as 'a reduction of the amount of damages ... based on facts which show that the plaintiff's conceded cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify.' ") (quoting *Black's Law Dictionary* (4th ed.1968)). The doctrine of mitigation is concerned with the compensatory aspect of tort and contract law. 25 *C.J.S. Damages* § 96 (1966).

Mitigation of damages also has been invoked in the field of property law. It has, for example, been applied in cases presenting claims based on nuisance. *E.g., Dickinson v. Delaware, L. & W. R.R. Co.,* 90 *N.J.L.* 158, 100 *A.* 203 (E. & A.1917) (reciting general rule that one suffering a nuisance must take measures to reduce his or her damages). The duty to mitigate damages is also recognized in the context of landlord-tenant law. *E.g., Sommer v. Kridel,* 74 *N.J.* 446, 456–57, 378 *A.*2d 767 (1977) (recognizing that landlord has duty to mitigate damages caused by defaulting tenant by finding another tenant).

The doctrine of mitigation of damages has been applied to condemnation actions, and, in that context, is sometimes referred to as the "cost of cure" or the doctrine of avoidable costs. 4A *Nichols on Eminent Domain* § 14A.04 (Sackman & Van Brunt eds., 3d ed. rev.1997). Most cases that have considered mitigation of damages in a partial-taking condemnation action have done so where the cost of cure is based on actions that can be taken by the owner-condemnee relating directly to the remaining property. *See, e.g., State v. Birch,* 115 *N.J.Super.* 457, 463, 280 *A.*2d 210 (App.Div.1971) (holding, in a partial-taking condemnation that left remaining property landlocked, that trial court should have instructed the jury that the owner would have to comply with local ordinances in building an access road on the remaining property and that "the cost of ameliorating or curing that condition was an important factor to be considered in arriving at its fair market value"); *State v. Sun Oil Co.,* 160 *N.J.Super.* 513, 390 *A.*2d 661 (Law Div.1978) (determining that property owner had a duty to

mitigate damages in a partial-taking condemnation by undertaking work on its remaining property to relocate sewer and water-pipe laterals, electric lines, and underground gasoline storage tank where it was reasonable to do so); *Broward County v. Patel,* 641 *So.*2d 40 (Fla.1994) (holding that state may submit evidence that severance damages of the condemnee may be cured or lessened by alterations to condemnee's remaining property); *Board of Educ. v. Commonwealth,* 528 *S.W.*2d 657 (Ky.1975) (finding that school had duty to mitigate damages caused by partial taking of school playground and that duty could be satisfied in part by soundproofing and airconditioning existing school building).

In this case, however, it is asserted that the duty of the landowner to mitigate damages implicates actions involving not only the property that was subject to partial condemnation, but also property not owned by the condemnee. This argument presents an issue of first impression in New Jersey. Other jurisdictions have considered the doctrine of mitigation damages in those circumstances, however, and their reasoning is instructive.

Recently, the Georgia Court of Appeals ruled that evidence of the availability of substitute property could be used affirmatively by the condemnee in determining consequential damages in a partial-taking case. *Department of Transp. v. 2.953 Acres of Land,* 219 *Ga.App.* 45, 463 *S.E.*2d 912 (1995). The condemnees claimed that the partial taking left them with an irregularly-shaped piece of land that could not be used as a site for a warehouse large enough to meet their business's growing needs. As a result, they were forced to purchase an adjacent tract of property for $200,000, and submitted that price as the cost to cure the damages suffered to their remainder property. The court found that the trial court had not erred in admitting evidence that the property owner was precluded by the taking from expanding its existing business and had to buy additional land in order not to lose future growth. *Id.* 463 *S.E.*2d at 915; *see also State v. Nisbet Properties, Inc.,* 309 *So.*2d 398, 402 (La.Ct.App.1975) (upholding admission of condemnee's evidence of purchase of an adjoining

tract of land as substitute property in determining severance damages).

In *Department of Transp. v. Old Nat'l Inn, Inc.*, 179 *Ga.App.* 158, 345 *S.E.*2d 853, *cert. vacated*, 256 *Ga.* 315, 349 *S.E.*2d 748 (1986), the court allowed evidence of the cost of substitute property to be introduced by the condemnor in a partial taking action. There a hotel lost a 0.8 acre section of vacant land it intended to use as a parking lot. A plurality of the court agreed that the availability and value of substitute land could be considered by the jury, although it was improper to calculate consequential damages by valuing the actual taking and then subtracting from that figure the value of the substituted land. The court stated:

> Although the set-off theory as testified to by DOT's experts was improper, the availability and value of any substitute land can be considered as an element reasonably affecting fair market value of the remainder as well as an element of new circumstances of the remainder just after the time of taking in arriving at a new consequential damage figure. . . . Obviously, the consequential damage would be greater if that land, which would adequately serve the purpose intended for the taken land, was not available. . . .

[345 *S.E.*2d at 857.]

*See also Board of Educ. v. Commonwealth, supra,* 528 *S.W.*2d 657 (sustaining, in partial taking of school playground, admission of evidence that the school could be restored to its former condition of utility in part by acquisition of neighboring private land for a new playground).

An argument advanced against the application of the doctrine of mitigation of damages in the form of evidence of replacement property is that it would amount to specific performance. That argument was the focus of *Utah Dep't of Transp. v. Rayco Corp.*, 599 *P.*2d 481 (Utah 1979). There, a shopping center lost a substantial number of its parking spaces as a result of a taking by the state to widen a road. Experts for both sides agreed that the remainder suffered damages as a result of the taking, in part because the taking reduced the number of parking spaces below the number required by the applicable zoning ordinance. The parties disputed whether those severance damages could be miti-

gated by the state's acquisition and improvement of replacement property.

Under prior Utah decisional law, "the value of the property condemned [was] the cost of substitute land which would place the condemnee in the same position he had prior to condemnation." *Id.* at 489 (citations omitted). A plurality of two justices rejected that law, reasoning that "[i]t is a violation of the expressed legislative intent when the remainder is, in fact, damaged to deny severance damages by compelling the condemnee to procure substitute property with his own funds, which allegedly will be reimbursed by means of the compensation paid for the land condemned." *Id.* at 490. According to their view, the state, in effect, was forcing the replacement property on the landowner:

> The State's theory of mitigation of severance damage by replacement land ... is tantamount to compelling the condemnee to take substitute land in lieu of money for the damages sustained.... This court has held that just compensation for property taken for public use means compensation in money; that it would make no difference how valuable the property that was contemplated as a substitute is, it could not be substituted in lieu of money, against the wishes of the condemnee.... There is no meaningful distinction between the state, in this case, purchasing the school land and compelling defendant to accept it as compensation and confining defendant's damages to the value of the school land.
>
> [*Ibid.*]

The analogy to specific performance, which supported the reasoning of the Utah court's plurality, is not really apposite in partial-taking condemnation actions. Resort to the construct of specific performance in this context shifts the proper focus of condemnation actions, namely, the determination of just compensation based on the fair market value of the property that is subject to condemnation. *Silver, supra,* 92 *N.J.* at 514, 457 *A.*2d 463. Market value is determined by what a willing and reasonable buyer and seller, both unconstrained, would agree is the fair price of the property. *Id.* at 513, 457 *A.*2d 463. What should be critical in that determination is not whether a property owner may be compelled to acquire substitute property, but whether, under all of the surrounding circumstances, reasonable and willing parties

would consider the availability and use of such property as bearing on the market value of the owner's remaining property.

■ The availability and use of replacement property can be a material consideration that is relevant to market value as the basis for just compensation, just as it can be a factor that informs the negotiations between a willing buyer and seller. As the court observed in *Nisbet Properties, supra,* in allowing evidence of the purchase of substitute property, "[c]ost to cure and replacement cost are not of themselves precise mathematical measures of damages, but they are useful evidence and tools in arriving at a proper award." 309 *So.*2d at 402. Further, the failure to consider the availability of replacement property when it would otherwise be reasonable to do so might in fact distort the actual damages resulting from a partial taking. *See Rayco, supra,* 599 *P.*2d at 495 (Crockett, C.J., dissenting) ("The rule [precluding evidence of availability of replacement property] which the majority opinion appears to espouse impresses me as unnecessarily rigid and may have the effect in some instances of awarding excessive damages by requiring the courts to treat as irreparable, injuries which could be minimized.").

The concern that the use of replacement property in determining severance damages may be equated with or analogized to specific performance is greatly overstated. Other courts have disagreed with the proposition that, in a condemnation case, analogy to specific performance precludes consideration of replacement property in mitigation of damages. *E.g., Carillion Realty Corp. v. State,* 158 *Misc.*2d 810, 602 *N.Y.S.*2d 76, 79–80 (N.Y.Ct.Cl.1993) (finding no loss of access to the remainder after a taking, where landowner refused state's offer to provide a permanent right-of-way through neighboring property that the state had acquired, and noting, further, "[c]laimant confuses a condemnee's duty to mitigate damages with a condemnor's right to provide substitute access. Where access has been destroyed or impaired and the condemnee can reestablish it, it may do so, or may have been deemed to have done so...."), *aff'd,* 212 *A.D.*2d 660, 623

*N.Y.S.*2d 146 (1995). *Cf. Porrata v. United States,* 158 *F.*2d 788 (1st Cir.1947) (finding that a condemnor had a right to introduce evidence of substitute property as mitigation of damages in a partial-taking case independent of whether the condemnee had a duty to mitigate involving the acceptance of substitute property).

■ Evidence of available replacement property in mitigation of damages does not equate with compelling the condemnee to purchase the property. Cost-of-cure damages, for example, authorize the introduction of evidence that a condemnee can reduce its damages by taking corrective measures to improve the remainder property even though such action need not be taken. In *Sun Oil Co., supra,* the State argued that it had a right to do on-site repair work necessary to restore the gas station because its cost would be less than the diminution in market value of the remainder, absent the repairs. 160 *N.J.Super.* at 532, 390 *A.*2d 661. Although the court determined that the State itself did not have the right to carry out repairs on the remainder without an easement, it concluded that the owner had a duty to mitigate damages where it is reasonable to do so, and that the owner's compensation could be limited by that amount whether or not the owner did the work. *Id.* at 533–34, 390 *A.*2d 661.

The key to the relevance of action taken in mitigation of damages is whether such action is fair and reasonable. As observed by the dissenting justice in *Rayco, supra:*

> A condemnee should not be awarded damages as if the taking rendered his remaining land unfit for its established use if the means of cure, or of minimizing damages, is available by exercising reasonable prudence; and this is true even if it involves making expenditures for substitute facilities, whether within his own land or outside its boundaries.
>
> *[Id.* at 494 (Crockett, C.J., dissenting).]

Similarly, in *Board of Educ. v. Commonwealth, supra,* the court upheld the jury verdict, ruling that the cost of restoration of the land, where feasible, was not precluded:

> From the standpoint of simple reasonableness, surely the law would not be that the board of education should be awarded one million dollars for a new school if the existing one can in fact be restored to equal or better utility for only $238,000.
>
> [528 *S.W.*2d at 658–59.]

The concern that evidence of the availability and use of replacement property in respect of severance damages is tantamount to specific performance is strongly influenced by the traditional common law notion that each parcel of real property is unique. *See* E. Allan Farnsworth, *Contracts* § 12.6 at 829 (1982). The perception that no two parcels of real property are alike, however, does not call for the reflexive and rigid rule that evidence of replacement property must be equated with the forced acquisition of that property. Rather, the concern over the uniqueness of real property in this context enters into the analysis when considering the threshold issue of the comparability of the replacement property, that is, the extent to which the replacement property is sufficiently similar to the property taken. The similarity of such property bears on whether it may be considered useful and available in conjunction with the remainder property. The basic issue is whether it is reasonable and fair to consider that property as a substitute for the property taken. Thus, in *Rayco, supra,* concurring with the decision to remand for a redetermination of damages, one justice stressed the need for similarity:

> [T]he cost of cure measure of severance damages is applicable only when the replacement property would totally cure the damage caused by the condemnation to that portion of land not condemned. The evidence in this case falls woefully short of showing that the condemnees were as well off with the replacement land as with the land subject to the actual taking.
>
> [599 *P.2d* at 493 (Stewart, J., concurring).]

The Appellate Division noted that in the *Rayco* case the Utah supreme court "found that the replacement property could not ameliorate the problems caused by the State's acquisition." 287 *N.J.Super.* at 298, 671 *A.2d* 121. It found the same limitation present in this case, because a building on the Firth property would require demolition and hazardous materials were required to be removed. *Ibid.* The State vigorously disputes that finding, claiming that its offer stated the Firth property would be "conveyed as vacant land with all improvements and environmentally hazardous materials removed...." The Appellate Division further found that, in contrast to *Rayco*, the proposed replacement

property is zoned for the same usage as the condemned property. 287 *N.J.Super.* at 298, 671 *A.*2d 121.

The issue of the similarity of replacement property is primarily factual. The degree of similarity is relevant to the issue of whether under all of the circumstances it would be reasonable for the condemnee to accept property that is available and contiguous to the remainder property as a suitable substitute or replacement for the property taken when that will reduce or eliminate the damages to the remainder property. It is an issue that can be presented readily through testimony and evidence, including the opinions of experts, and determined by the fact-finder.

■ Accordingly, we now hold that a condemnee seeking severance damages in a partial-taking condemnation action has a duty to mitigate those damages. The court may consider evidence of the availability and use of similar replacement property, when, under all of the surrounding circumstances, such property would reasonably affect the fair market value of the remainder property. Such evidence may be used in mitigation of damages in determining just compensation in a partial-taking condemnation case.

■ The duty to mitigate damages involving the availability and use of replacement property should apply prospectively. The rule we have adopted amounts to a "departure from existing law," *State v. Burstein,* 85 *N.J.* 394, 403, 427 *A.*2d 525 (1981), and not a "principle plainly looming on the horizon." *Williams v. Bell Tel. Lab., Inc.,* 132 *N.J.* 109, 123, 623 *A.*2d 234 (1993).

Here, the parties could not have fully anticipated the possibility of the need to consider replacement property to discharge a duty to mitigate damages in calculating severance damages. In the context of this case, the availability of the replacement property would have placed an affirmative obligation on the Weiswassers to determine the suitability of that property and the feasibility of its inclusion in their remaining property. Even though the parties negotiated over the availability of the replacement property, those negotiations were predicated on an effort to resolve amicably the

matters in dispute. Moreover, the trial court ruled that evidence of replacement property was inadmissible. The parties thus did not proceed on a sufficient understanding that the law would require replacement property to be considered as a part of severance damages in a partial-taking condemnation.

Furthermore, because the parties relied on the old law, retroactive application of the new law would not serve the interests of justice. *Williams, supra,* 132 *N.J.* at 122, 623 *A.2d* 234. Consequently, we hold that the rule should be applied prospectively but, in respect of cases pending in the trial courts, the rule may be applied on the application of either party, that is, the condemnor or condemnee, by the trial court for good cause.[2]

## III

The Appellate Division held that the trial court had correctly permitted evidence of a loss of visibility as an element of the severance damages to the remainder property. 287 *N.J.Super.* at 294, 671 *A.2d* 121. The court found that the loss of visibility in this case would have a direct effect on the Weiswassers' marketing costs in developing the property into single-family residences. *Id.* at 304, 671 *A.2d* 121.

The State contends that the basis for allowing damages based on loss of visibility, namely, the increased costs attributable to marketing for development of the land, has been disapproved in New Jersey as too speculative and uncertain. *See State v. Cooper Alloy Corp.,* 136 *N.J.Super.* 560, 347 *A.2d* 365 (App.Div.1975) ("Just compensation generally does not include losses or costs that are incidental to a taking, such as ... frustration of the con-

---

[2] In light of our decision to apply the duty to mitigate damages prospectively, we need not address the Appellate Division's application of laches to bar the State's use of the Firth property as evidence of just compensation. 287 *N.J.Super.* at 300, 671 *A.2d* 121. We note, however, that the record in this case does not readily support the finding of laches. The reasons for the various and lengthy delays remain more or less unexplained, and it appears that both parties pursued a dual approach of negotiation and litigation.

demnee's plans. These items are generally held not to be directly attributable to the realty, but rather peculiar to the owner."). Nevertheless, in this case the experts specifically acknowledged the loss of visibility as an element affecting the value of the remaining property. Borden, the State's expert, testified:

Essentially, by the taking the development of the residential tract has lost as I considered the advantage of having property along the major highway of Route 38 for exposure purposes. As a practical matter, the fact that it was located on Route 38, as I've seen in many instances, developers have utilized sample homes for display purposes and I felt that at least two dwellings could be placed on that site with appropriate advertising and exposed to the tremendous new traffic on Route 38 by reason of the improvement, changing it from a two lane to a four lane highway with ample side roads, that the developer would be able to sell off his residential tract more readily because it would be more readily exposed to the public by just driving by, coupled with the fact that he would not have to do extensive advertising.... And for that reason I felt it added a measure of value to the property in the before [condition].

This Court has recognized the principle that a property owner does not have an absolute right to a particular form of access to a public highway, but only to reasonable access:

It seems to be agreed in New Jersey, as elsewhere, that in the absence or denial of all highway access, the general rule is that the property owner is not entitled to access to his land at every point between it and the highway, but only to free and convenient access to his property and the improvements on it.

[*High Horizons Dev. Co. v. Department of Transp.*, 120 *N.J.* 40, 48, 575 *A.*2d 1360 (1990).]

*See also Lima & Sons, Inc. v. Borough of Ramsey*, 269 *N.J.Super.* 469, 477, 635 *A.*2d 1007 (App.Div.1994) ("We ... conclude that a property owner clearly is entitled only to reasonable access to the system of public roadways"); *N.J.S.A.* 27:7–90e ("Every owner of property which abuts a public road has a right of reasonable access to the general system of streets and highways in the State, but not to a particular means of access.").

The Appellate Division in *State v. Van Nortwick*, 260 *N.J.Super.* 555, 617 *A.*2d 284 (App.Div.1992) (*Van Nortwick I* ), was presented with the question of whether diminution of access to a highway was a compensable element of a partial-taking condemnation. The Appellate Division held that it was reversible error for the court to have failed to exclude diminution of access as an element of

damages. The court, however, distinguished between diminution of access that was not in itself compensable, and other conditions of the property caused by such diminution that were compensable:

> Although a diminution of access may cause other conditions on the property itself which may be compensable, as for example, as noted by defendant's expert ..., such things as a limitation of design options or on-site maneuverability, as long as the remaining access is reasonable, the diminution *per se* is not compensable.
> [*Id.* at 558, 617 A.2d 284.]

On remand, the trial court allowed the landowner's expert to testify to the loss in value to the remainder property through limitations on building design and reduced vehicle maneuverability as a result of the diminution of access. The State appealed that decision and the Appellate Division held "any such on-site impact was compensable as part of severance damages." *State v. Van Nortwick*, 287 *N.J.Super.* 59, 63–64, 670 A.2d 548, (App.Div.) (*Van Nortwick II* ), *certif. denied*, 143 *N.J.* 320, 670 A.2d 1061 (1995). The appellate court further found that the jury was properly instructed to consider the on-site damages resulting from the diminished access only if they were "actual and specific to this property." *Van Nortwick II*, 287 *N.J.Super.* at 73, 670 A.2d 548; *see also State v. Inhabitants of the Town of Phillipsburg*, 240 *N.J.Super.* 529, 547–48, 573 A.2d 953 (App.Div.1990) (finding, where the taking and highway construction had left one remainder cut off from another, that the increased cost of developing the remainder section of the property was compensable).

It is also established that a change in traffic patterns resulting in damages to a property owner is not considered a compensable taking. *E.g., State v. Charles Inv. Corp.*, 143 *N.J.Super.* 541, 545, 363 A.2d 944 (Law Div.1976) (holding that property owner was not entitled to compensation for the economic harm suffered as a result of the decreased traffic flow directly in front of his station), *aff'd*, 151 *N.J.Super.* 14, 376 A.2d 534 (App.Div.1977), *aff'd*, 76 *N.J.* 86, 385 A.2d 1227 (1978); *State v. Monmouth Hills, Inc.*, 110 *N.J.Super.* 449, 266 A.2d 133 (App.Div.) (rejecting the owner's claim for additional compensation for the damages in an amount equal to the cost of installing ramps to improve access to the

remainder property when the damages were attributable to the closing off of an opening in the highway median strip), *certif. denied,* 57 *N.J.* 133, 270 *A.*2d 36 (1970).

■ Loss of visibility as an element of severance damages may be related to a loss of access and the basis for the compensability for such damages would be whether the loss is attributable to the taking of the property itself or off-site conditions. In *State v. Stulman,* 136 *N.J.Super.* 148, 345 *A.*2d 329 (App.Div.1975), the court specifically considered a damages claim based on the loss of visibility. The court rejected the owner's argument that he was entitled to compensation for the loss of visibility of his property because the loss resulted, not from the partial taking in the case, but from the construction of a new highway on property belonging to others. *Id.* at 162, 345 *A.*2d 329.

Other courts are split on whether loss of visibility is compensable in a partial-taking action. *See generally* Tracy A. Bateman, Annotation, *Eminent Domain: Compensability of Loss of Visibility of Owner's Property,* 7 *A.L.R.*5th 113 (1992). Most courts have not recognized a property interest in maintaining the visibility of one's property:

> Generally, this right is denied, principally upon the theory that one has no control over his neighbor's property and therefore could not prevent his neighbor, under most principles of real property law, from erecting barriers to prevent his right to be seen. Therefore a taking by a public authority takes nothing from him.
> [4A *Nichols on Eminent Domain* § 14A.03[4] (Sackman & Van Brunt eds., 3d ed. rev.1997).]

*E.g., State v. Schmidt,* 805 *S.W.*2d 25 (Tex.Ct.App.1991), *rev'd* 867 *S.W.*2d 769, 774 (Tex.1993) (holding that the owners were not entitled to compensation for diminution of value of the remainder due to lessened visibility, increased circuity of travel, or diversion of traffic, and stating that "[j]ust as a landowner has no vested interest in the volume or route of passersby, he has no right to insist that his premises be visible to them."), *cert. denied, Schmidt v. Texas,* 512 *U.S.* 1236, 114 *S.Ct.* 2741, 129 *L.Ed.*2d 861 (1994); *Acme Theatres, Inc. v. State,* 26 *N.Y.*2d 385, 310 *N.Y.S.*2d 496, 500, 258 *N.E.*2d 912, 914–15 (1970) ("Our courts have consistently

refused to award consequential damages because the owner's property is no longer visible to passing motorists...."); *Forest City Enterprises v. State,* 91 *A.D.*2d 839, 458 *N.Y.S.*2d 397, 398 (1982) ("Aside from decreasing the size of claimant's tract, the only other effect of the appropriation was a lessening of visibility from the Millersport Highway to the remainder parcel. Loss of visibility is not compensable."), *aff'd,* 59 *N.Y.*2d 884, 465 *N.Y.S.*2d 934, 452 *N.E.*2d 1262 (1983).

The Alaska supreme court reached a different conclusion in *8,960 Square Feet v. Alaska,* 806 *P.*2d 843 (1991). In that case, the state sought to condemn a portion of a parcel of property in conjunction with altering and improving the abutting road. Two aspects of the project diminished the visibility of the remaining property: (1) the project entailed the construction of a railroad overpass, which would require the creation of a gradually rising earthen berm constructed totally on property owned by the railroad, and (2) the abutting road would be lowered between five and seven feet from its original level and part of the newly expanded and lowered road would be constructed on the land taken from the owner.

The court rejected the claim for lost visibility attributable to the construction of the earthen berm. *Id.* at 845–46. The court ruled that because the owners had no easement over the property owned by the railroad, and because the earthen berm was to be constructed solely on the railroad's property, loss of visibility attributable to the berm was not compensable. The court held, however, that the landowner could recover for loss of visibility as a result of the widening and lowering of the abutting road because those changes, unlike the construction of the earthen berm, involved property of the owner that was taken. It stated:

Ownership of land gives the owner the right and ability to limit any obstructions from being placed on that land. In particular, ownership of land abutting on a road gives the owner the right to control the visibility of all adjoining land further off the road. This obviously can be an important commercial asset. Thus when the state takes a parcel which abuts the road, it also takes the potentially valuable right to control the visibility of the remaining parcel. For this reason, we believe that the best rule in light of reason and policy is that loss of visibility to a

remaining parcel is compensable where that loss is due to changes made on the parcel taken by the state.

[*Id.* at 846.]

The Alaska supreme court made a distinction between visibility lost as a result of changes occurring off the taken land and visibility lost as a result of changes occurring on the taken land. It reasoned that if the landowner has a right not to build on his land in order to maintain visibility, that right is taken with respect to that portion of the land taken and thus should be compensable.

The decisional law in other jurisdictions supports the Alaska approach. In *Louisiana v. Manning,* 322 *So.*2d 362 (La.Ct.App. 1975), the state condemned a portion of defendant's property for the construction of an entrance ramp to an interstate highway. Defendant lost frontage and visibility from the highways and lost the use of a billboard previously maintained for advertising purposes. Although not permitting a separate award for the loss of the use of the advertising billboard, the court permitted recovery for the loss of visibility: "Such an item of damage must necessarily be absorbed into the reduction of the market value of the remainder after the taking by the expropriating authority." *Id.* at 366. The court did not discuss whether damages for loss of visibility occasioned by construction undertaken without a taking of defendant's land would give rise to a claim for compensation.

The court in *Schmidt, supra,* was "reluctant to hold that such damages can never be recovered," and based its holding in part on the findings that the lost visibility damages resulted from modifications of the existing highway and not from the use of the small strip actually taken from the condemnee, and that the impaired visibility did not affect the condemnee's land in a "special, unique way, different from the effect on the surrounding area." 867 *S.W.*2d at 781. When visibility is impaired by virtue of construction that occurs off the landowners property, no right has been taken and therefore compensation is not due. *Ibid.; cf. People v. Ricciardi,* 23 *Cal.*2d 390, 144 *P.*2d 799 (1943) (noting that under California law, property owners abutting a public roadway "possess . . . an easement of reasonable view of their property from

such highway" and, although an abutting landowner has no right to compensation by reason of diversion of traffic away from its property, a landowner could introduce evidence that the loss of visibility caused by the taking affected the market value of the remaining property).

The critical factor, therefore, in determining if loss of visibility is a compensable element of damages in a partial-taking condemnation, is whether the loss arises from changes occurring on the property taken.

The Appellate Division here found that "the facts of this case fall within a narrow exception to any rule which would prohibit an award of compensation for a diminution in visibility." 287 *N.J.Super.* at 302, 671 *A.*2d 121. It concluded that the trial court appropriately distinguished "between an award of damages for loss of visibility, which are not permitted, and damages to the remainder by way of increased development costs, attributable to a loss of visibility, which are permitted...." *Id.* at 305, 671 *A.*2d 121. The distinction is that the loss of visibility to the remainder is directly attributable to the reduced frontage as a result of the property taken, and thus is compensable.

We hold that just compensation requires compensation for the diminution of value of the remainder property that is specifically attributable to visibility lost as a direct result of the removal of other portions of the property through a partial-taking condemnation.

### IV

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.